Filed 6/17/14  P. v. Walker CA1/1
## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>BRUCE ALAN WALKER,<br><br>    Defendant and Appellant. | A135326<br><br>(San Mateo County<br>Super. Ct. No. SC70299A) |

### INTRODUCTION

Following dinner and drinks, defendant got into his car with a passenger and drove at a high rate of speed on El Camino Real in Burlingame, passing other cars and causing his car to spin out, hit a tree, and flip over.  Defendant was injured and the passenger was killed. Defendant's blood-alcohol concentration (BAC) two and a half hours after the accident was 0.20 percent, more than twice the legal limit of 0.08 percent.  Defendant had three prior arrests for driving under the influence (DUI) of alcohol.  One resulted in a DUI conviction; another resulted in a conviction for an alcohol-related driving lesser offense to DUI, and the most recent arrest, involving a single car accident in Wisconsin, resulted in drunk-driving charges that were dismissed in light of the current prosecution.

The San Mateo County District Attorney charged defendant with murder and gross vehicular manslaughter while intoxicated.  (Pen. Code, §§ 187, subd. (a), 191.5, subd. (a).)  In a first trial, the jury convicted defendant of gross vehicular manslaughter but could not agree on the murder charge.  The court declared a mistrial and, after a second trial, defendant was convicted of second degree murder.  Defense motions to set aside the

verdict and for a new trial were denied. Defendant was sentenced to state prison for 15 years to life for murder. Sentence for manslaughter was stayed. (Pen. Code, § 654.)

On appeal, defendant argues reversal of both convictions is required because the blood test result showing a 0.20 percent BAC was obtained without a warrant. He also argues the murder conviction should be reversed because the evidence is insufficient to support that conviction; the second jury should have been told of the vehicular manslaughter conviction; the instructions on implied malice were internally inconsistent; and jury misconduct occurred. We affirm.

### STATEMENT OF FACTS

On April 11, 2009, at 9:53 p.m., Officer Brett Murphy of the Burlingame Police Department was dispatched to Howard Avenue and El Camino Real (El Camino) in San Mateo County to handle a single-car collision. The posted speed limit on that part of El Camino is 35 miles per hour (mph). Murphy saw a silver Infiniti upside down in the northbound lanes of El Camino. Defendant was partially ejected from the driver's window. The passenger's side of the car was "severely damaged" from a collision with a tree. The passenger was restrained, hanging upside down in his seat and not responsive. He was identified as Daniel White and pronounced dead at 10:12 p.m. at the scene.

The car was registered to defendant, who lived one and a half blocks from the scene of the accident. A restaurant, Broadway Prime, was one and a half miles from the scene of the accident. Murphy determined the car was travelling southbound on El Camino in the far right lane when the right-side wheels collided with the raised concrete curb, causing the car to rotate 180 degrees and cross four lanes of traffic before hitting a Eucalyptus tree. The main point of impact with the tree was between the front and rear doors on the passenger side of the car. The vehicle hit the tree with enough force that it spun back and landed on its roof.

Paramedic Jeff Ver arrived at the scene of the accident at 9:58 p.m. The passenger was dead, but the driver was alive, so he was extricated from the car by the fire

2

department. When Ver first contacted defendant, he was immobilized on a gurney. Ver noticed blood and bone fragments on defendant's head, which he believed came from the passenger. Ver noted the "heavy smell" of alcohol from defendant. Defendant told Ver he had a "couple of drinks." He denied using any drugs that evening. His pulse was slightly elevated; pupils were normal and reactive to light. He did not complain of pain and was not bleeding. Ver left the scene to transport defendant to the hospital at 10:09 p.m., arriving at San Francisco General Hospital (SFGH) at 10:27 p.m.

Burlingame Police Officer Keky Duren learned at the scene that defendant had admitted drinking and was assigned by her superior to perform the DUI investigation. While en route to the hospital, she ordered a phlebotomist to come to SFGH to draw blood. Duren made first contact with defendant at 11:58 p.m. after obtaining permission from the duty nurse.

Duren smelled alcohol on defendant at the hospital. His eyes were bloodshot and watery. After speaking with defendant, she concluded he had been driving the car and was under the influence of alcohol. At 12:10 a.m., Duren decided to arrest defendant. She told defendant a blood sample would be needed and defendant replied, "Whatever." Duren read to him twice from the chemical test admonition form warning of the consequences if he refused to provide a sample. At some point between the first and second reading, she advised defendant that the passenger had been killed. Defendant became very alert and emotional. At the end of the second reading, defendant replied "no" to her request to take a blood test.

Bee Galindo, a paramedic and phlebotomist, brought to the hospital a sealed blood-testing kit containing two vials for taking blood samples. Galindo verified the vials in the kit contained a preservative. The preservative prevents contamination of the blood.

When Galindo first saw Duren and defendant in the trauma room, defendant was snoring. He had on an oxygen mask and was hooked up to an electrocardiogram. She

3

waited to do the blood draw until a nurse finished attending to defendant. She made the draw from the back of defendant's right hand. She used a sterile non-alcoholic swab to clean the area. She prepared the vials. She drew the samples at 12:35 a.m. Galindo was present when defendant said he did not want to submit to a blood test, but he was physically cooperative during the blood draw. The blood draw was completed without any technical problems by 12:45 a.m.

Duren took the vials, placed them in an evidence envelope, and placed the envelope between her shirt and the steel front plate of her bulletproof vest. That area does not get hot, and the hospital was cold. Unlike the police station, SFGH does not have a refrigerated box in which to place evidence. She stayed with defendant at the hospital until 10:00 a.m. At this time, she drove straight back to the police department and finally placed the samples in the refrigerated evidence box there. Community Service Officer Ramzi Mughannam took the vials to the crime lab.

Forensic pathologist Peter Benson conducted the autopsy of White on April 12, 2009. The deceased had suffered brain injuries, fractured ribs, contusions to the lungs, and internal bleeding. In Dr. Benson's opinion, death was caused by blood loss, shock, and traumatic injuries.

Several eyewitnesses testified about the collision. Julian Jacobs was driving southbound on El Camino in Burlingame that night. In his rear view mirror, he noticed a silver Infiniti "bearing down" on him; Jacobs believed the car "was imminently going to hit [him] at a very high speed of impact." Defendant changed lanes to pass Jacobs very close on the right side. He estimated defendant's speed as between 60 to 100 mph. He saw the car brake and switch lanes to avoid hitting another car ahead of Jacobs. Jacobs came upon the accident and called 911.

Julia Quinn, Jacobs's wife, was a passenger in his car. She noticed a car "flew" past them on the right. The car, a silver sedan, was travelling very fast, at a speed that "would scare you even on the freeway." She saw the car come up fast behind another

4

car, brake, and go around it "really close." Perhaps a minute later, she saw the car overturned and crashed into a tree.

Joseph Hegstrom was driving through the intersection of Burlingame Avenue and El Camino on a green light when he saw a silver Infiniti traveling southbound on El Camino at a rapid rate of speed, in excess of the speed one would drive on the highway. He had to accelerate through the intersection to avoid a collision. Hegstrom's wife, Marina, who was also in the car, believed the silver Infiniti was moving "really fast for El Camino," more than 60 or 70 mph, as it ran the red light at Burlingame. Shortly thereafter, the Hegstroms looped back around and passed the same car wrapped around a Eucalyptus tree at Howard Avenue and El Camino.

Cece Lawrence was stopped at a red light on El Camino at Howard. In her rear view mirror, she saw a car approaching her very fast. The car passed her so close, she thought it would hit her. She saw the car change lanes, hit a southbound curb with a shower of sparks, then spin around into the northbound lanes and hit a tree.

Another motorist, Edgar Garcia, saw the headlights of a car going southbound on El Camino bouncing up and down at a high rate of speed. After the car passed him, Garcia saw sparks coming off the car's right rear wheel in his rear view mirror. He watched as the car fishtailed into the northbound lanes; then he heard a crash.

Ronald Cosgrove, parts and service director at Peninsula Infiniti, testified about the service records for defendant's car. In 2007, the dealership's service shop recalibrated the cruise control on defendant's car after an outside body shop did some repairs and replaced part of the cruise control. In 2008, defendant complained the cruise control was non-operational, would not engage at times, and would not slow down when approaching a vehicle. The service shop road-tested the car and found the cruise control was operational, was working as designed, and did slow down as it a approached a slower vehicle in front and maintained that speed. A complimentary inspection of the car was performed and no problems were detected. Based on their maintenance records,

5

defendant's car did not have any problems with unintended acceleration or the braking system. The service shop had no complaints from customers about unintended acceleration, the braking system, or sticky floor mats with the particular model car driven by defendant.

Monica Arana had been dating defendant for about six months in April 2009. They frequently went to bars and restaurants together and drank, but she would not describe him as a heavy drinker in her presence. Arana knew defendant had prior DUI arrests and that he had recently been arrested in Wisconsin following a collision which was perhaps DUI-related. She also knew he had taken classes about driving under the influence. The relationship ended about a year after the accident.

On the evening of the accident, Arana and four members of her family met defendant for dinner at the Broadway Prime restaurant where he used to work. When she arrived, defendant was in the bar with White having beers. She saw him drink one beer. At dinner later, defendant ordered two bottles of wine. She believed defendant had one glass of wine. Defendant left the restaurant at 9:30 p.m. Arana took the car keys from defendant's pocket and gave them to White, telling the deceased not to let defendant drive the car. Defendant advised Arana he was going to meet some friends later that night.

Quoc Vuong was the bartender at the restaurant. He served defendant and White one beer each on the house. Bar records indicate defendant paid for three additional Heineken beers that night. He also paid for two bottles of wine and six dinners.

At SFGH, emergency medicine director Dr. John Brown treated defendant. Brown ordered a blood draw for alcohol at 10:20 p.m. A second draw took place at 3:20 a.m. Both blood samples tested positive for alcohol. The results of the first test were higher than the results of the second. Brown noted defendant had injuries to his chest, thorax, right lung, and ribs. Brown found nothing medically improper with taking a blood sample from a patient who was in defendant's condition at 12:35 a.m. Nothing Dr.

6

Brown heard on the audiotape of defendant, the police officer, and the phlebotomist suggested that defendant was endangered by anything the officer or phlebotomist did.

Amber Quelvog is an emergency room nurse at SFGH. She drew seven vials of blood from defendant at 10:32 p.m. Hospital records showed a second blood draw was performed on defendant at 3:30 a.m.

Alan Wu is the Chief of Chemistry and Toxicology at SFGH. The hospital uses an enzymatic method involving alcohol dehydrogenase to test whether ethyl alcohol is present in someone's blood and, if so, how much is there. The majority of hospitals in the world use this method. The calibration records for the device used to test defendant's blood were within predetermined specifications. The sample of defendant's blood received by the lab at 10:37 p.m. on April 11 tested positive for the presence of alcohol, as did the second sample received at 4:20 a.m. on April 12. The amount of alcohol found in the first sample was higher than the amount of alcohol found in the second sample. Defendant did not have lactate acidosis or severe liver disease that could trigger a false positive alcohol result.

Semi-retired forensic criminalist Nicholas Stumbaugh testified as an expert on blood-alcohol testing, the use of the gas chromatograph, the interpretation of blood-alcohol results, and the effects of alcohol on the human body and the ability to drive. He tested the blood sample drawn from defendant at 12:35 a.m. using a gas chromatograph. He reviewed the calibration logs and records for the device he used and determined it was working properly when he used it. The result of Stumbaugh's analysis showed that defendant had a BAC of 0.20 percent. Impairment occurs at a 0.08 percent BAC, whether a person appears to be drunk or not. Typical impairments include poor judgment, the inability to do the multitasking required by driving, and short-term memory loss.

An individual weighing 185 pounds would have to drink the equivalent of 15 drinks to measure 0.20 percent BAC five hours after consumption.[1] One 12-ounce typical American beer, one four-ounce glass of wine, or a one-ounce shot of hard liquor are drink equivalents. It would take considerably more than two beers and a glass of wine between 7:30 p.m. and 9:30 p.m. for an individual of that weight to have a BAC of 0.20 percent at 12:35 a.m. Such an individual drinking that amount would have no detectable alcohol in his or her blood at 12:35 a.m. or 3:00 a.m. On the other hand, if an individual weighing 185 pounds had a considerable amount of alcohol to drink prior to 7:30 p.m., in addition to three drinks between 7:30 p.m. and 9:30 p.m., he or she could reach 0.20 percent BAC at 12:35 a.m. Depending on the individual's drinking pattern, a person who tested 0.20 percent BAC at 12:35 a.m. would have a BAC at least as high as 0.08 percent and possibly as high as 0.25 percent two hours and 45 minutes earlier at 9:50 p.m. In Stumbaugh's opinion, hypothetical driving such as that described by the percipient witnesses to the accident was consistent with an individual driving with a BAC of 0.08 percent or above.

Stumbaugh also testified about the process of fermentation that can affect blood-alcohol testing results. He opined that at room temperature, it would take several days for significant fermentation to occur. The fact Duren kept the samples on her person between her shirt and her bulletproof vest for 10 hours did not comport with crime lab procedures but, in his opinion, did not affect the reliability of the test results, "[b]ecause a few hours at room temperature, or even at a somewhat elevated temperature, are not sufficient for significant fermentation to occur, and the sample was refrigerated after that time up until the time of analysis." When fermentation does occur, there is a change in color to brownish-green and an odor of putrefaction. There was no such evidence of fermentation in defendant's blood sample when he tested it.

---

[1] The parties stipulated defendant weighed 185 pounds at the time of his arrest.

8

Santa Clara County Crime Lab criminalist Francisco Alcantar analyzed a sample of defendant's blood for cocaine and benzoylecgonine, an inactive cocaine metabolite. He used the same vial of defendant's blood tested by Stumbaugh for alcohol. The results were positive for benzoylecgonine in the amount of 0.226 micrograms per milliliter. Presence of benzoylecgonine in the blood indicates the subject who provided the blood sample recently used cocaine.

Bill Posey, co-founder of Central Valley Toxicology, an independent lab in Clovis, California, testified as an expert in forensic toxicology. In April 2010 he analyzed defendant's blood from the same sample tested by Stumbaugh and Alcantar. His analysis detected 0.23 milligrams per liter of benzoylecgonine and 0.09 milligrams per liter of cocaethylene in defendant's blood. Cocaethylene is an active metabolite of cocaine, which means it has the same stimulating property as cocaine. Cocaethylene is formed in the liver when alcohol is present in the body at the time of the cocaine use. Cocaethylene enhances the effects of cocaine in that it tends to make the euphoric effect last longer. Although cocaine is a stimulant, when ingested with alcohol the rebound effect of the combination actually exacerbates the depressive effect of alcohol consumption.

Posey quantified a 0.09 milligrams per liter level of cocaethylene as "a moderate amount." An individual with 0.09 milligrams per liter of cocaethylene in his system would be feeling some of the effects of cocaine use. Posey estimated that if a person ingested cocaine before 9:50 p.m. and had 0.09 milligrams per liter of cocaethylene in his system at 12:35 a.m., the amount of cocaethylene in his system at 9:50 p.m. would have been 0.18 milligrams per liter, or higher. Considering the amounts of both benzoylecgonine and cocaethylene in defendant's blood, Posey estimated that defendant used cocaine within six to eight hours of the blood draw.

Cocaine's effects on driving include the tendency to make quick but incorrect decisions, dilation of the pupils causing night blindness in response to oncoming vehicles,

9

and overcorrection for particular situations such as crossing too many lanes or turning too sharply. The effects of cocaethylene are similar.

Posey, like Stumbaugh, did not believe the lack of refrigeration of the blood sample for 10 hours would result in fermentation of the blood in the sample. "Typically, about six days is going to be required before you'll see any major effects on the blood-alcohol level."

Auto accident experts also testified for the prosecution. Raymond Hughes testified as an expert in automotive engineering and forensic automotive investigation. He examined defendant's car in 2010. He found no problems with the throttle body or the butterfly valve. The acceleration (gas) pedal worked properly. There were no recalls for defendant's type of car concerning unintended acceleration. There were no recalls concerning the braking system. The maintenance record for the car revealed no abnormalities and his inspection of the car revealed there were no leaks in the brake piping. The antilock braking system (ABS) was connected.

Rudy Degger testified as an expert in forensic traffic collision reconstruction. Based on his observation and analysis of the accident scene and the car involved, he concluded that the right side wheels of defendant's car struck the curb. The car then took an aggressive turn to the left, which caused the car to spin counterclockwise until it hit the Eucalyptus tree. He opined the car was traveling 56 to 62 mph when it began to spin. The car bounced away from the tree after hitting it but continued to rotate 180 degrees and came down on its top about six feet away from the tree. Degger opined it was unlikely defendant braked during the initial phase of the spin but there may well have been some braking towards the end of the spin. In his view, the car hit the curb because it was traveling too fast.

The jury was presented with several incidents of defendant driving under the influence of alcohol. On August 9, 1997, Millbrae Police Officer Gaby Chaghouri observed defendant speeding on El Camino and arrested him for driving under the

10

influence because of his driving, objective symptoms of alcohol intoxication, smell of alcohol, admission he had been drinking (two beers and a rum and Coke), and performance on several field sobriety tests. He submitted to a blood test and was convicted of driving under the influence.

On February 25, 2001, Burlingame Police Officer Charles Witt observed defendant speeding and making an unsafe left turn, and arrested him for driving under the influence. Defendant smelled of alcohol, admitted drinking two glasses of wine, had watery, droopy eyes, and performed inconsistently on field sobriety tests. Nystagmus was not present. Defendant submitted to a breath test. He was convicted of an alcohol-related driving offense, lesser to a DUI.

On February 16, 2009, two months before this accident, defendant was involved in a one-car collision in Wisconsin. Law enforcement officers followed a trail of fluid to a restaurant parking lot where they found defendant loading luggage from a car with body damage into a taxi. Defendant smelled of alcohol and appeared intoxicated. He admitted he had been drinking that night. Defendant submitted to a blood draw. The Wisconsin case was dismissed because of defendant's arrest and prosecution in the current case.

Retired California Highway Patrol Officer Vaughn Gates testified as an expert in drug impairment recognition and driving under the influence of drugs. He testified cocaine is a central nervous system stimulant. Its ingestion makes a person an aggressive driver, and impairs driving and visual perception. He cited speeding, making sharp turns, and getting too close to cars as examples of aggressive driving associated with driving under the influence of cocaine. Alcohol ingestion depresses the central nervous system, causing visual impairments, slow reactions, and poor judgment decisions. Combining cocaine ingestion with alcohol consumption extends the euphoric effect of the alcohol. It also gives a person the false feeling of not being intoxicated, causing what he called a "wide-awake drunk."

Janet Brooke is the lead drug and alcohol counselor at Occupational Health Services (OHS) in Santa Clara County and was previously employed as a counselor at OHS in San Mateo County. Her job entailed working with the courts and the state to help persons convicted of driving under the influence get their driving privileges back. OHS provides education programs on the dangers of drinking and driving for first-time and multiple-time offenders.

Defendant completed the First Offender Program for the first time in August 1998. Following his conviction on February 25, 2001, defendant again enrolled in a First Offender Program on July 26, 2001 and completed the 14-hour program on August 29, 2003. Ms. Brooke was his counselor. In the course of that program, he completed a module on the medical aspects of alcohol and other substances, including cocaine. He completed another module on the impact of drunk driving on families whose members have been killed by drunk drivers. He completed another module on impairment and the laws which informed the students that impaired driving resulting in death can trigger murder and manslaughter prosecutions.

In his defense, defendant presented the testimony of one eye witness, pedestrian Paulina Rencoret, who saw defendant driving the car just before the collision. She estimated his speed at 40 to 45 mph. Defendant called Officer Duren to testify in connection with defendant's digitally recorded statement made at the hospital.

Defendant also presented several experts who challenged the testimony of the prosecution's experts. Dr. Mark Shattuck testified as an expert in accident reconstruction and analysis of automobiles and the biomechanics of automobile accidents. He opined that unintentional acceleration would be one reasonable explanation for the car's speeding through various trajectory changes, whether or not the driver was sober or impaired. Deliberate speeding could be another, but it would be unusual. He also concluded that a clip securing the driver's side floor mat broke prior to the accident, and opined that the mat could have moved forward and entrapped the pedals.

12

Dan Denney is the CEO of a biotechnology company.  He testified as an expert on the effect of microorganisms on human blood samples.  Mr. Denney was critical of Stumbaugh's conclusions.  In particular, he opined the 0.03 difference in BAC's (0.20 and 0.23 percent) obtained by two different labs from serially drawn samples could only have been caused by microorganisms.  In his view, defendant's blood sample had been "grossly mishandled" and "you can't trust it."  He assumes every blood sample is contaminated with some type of microorganism.  Swabbing with isopropyl before extracting blood does not kill all the organisms that could contaminate a sample.  A contaminated test tube would not necessarily emit an odor.  An appearance of coagulation of the blood in the test tube would be consistent with contamination of the tube by microorganisms.  The length of time it took the phlebotomist to draw the blood from defendant's hand suggested the blood was not drawn from a vein.

Ken Mark, a forensic toxicologist who owns and operates a lab in Hayward, testified as an expert in the detection of alcohol in human fluids and the effect of alcohol in the human body.  He received an unrefrigerated sample of defendant's blood through first class mail.

Mark tested the vial for alcohol and preservative levels and found several problems.  He opined that if it took a phlebotomist 10 minutes to complete a blood draw, the sample may have been drawn from a capillary bed instead of a vein; California regulations require a venous blood sample.  His test yielded a BAC result of 0.23 percent, which is 15 percent higher than the 0.20 percent BAC result obtained by the original lab.  He considered a difference of 0.03 percent very rare.  He agreed the forensic community accepts a 15 percent discrepancy as a sign that fermentation has occurred.

Mark also found the vial contained 14.8 milligrams per milliliter of the preservative sodium fluoride, which exceeded the lab standard of 10 milligrams per milliliter.  Also, the blood in the vial he received contained a coagulated clot.  This was an indication the blood was not adequately mixed with anticoagulant and sodium

fluoride.  However, he believed the clot had a minimal effect on the test result.  While admitting that California regulations did not explicitly require refrigeration, he believed a blood sample should be immediately refrigerated upon collection "to minimize the chance of microbial growth that would either increase or decrease the alcohol content."

While he was employed as a supervisor by the San Mateo County Forensic Lab, Mark commissioned a study of the efficacy of sodium fluoride in varying amounts as an antimicrobial agent.  The study found refrigeration was better than 10 milligrams per milliliter of sodium fluoride at protecting against fermentation when yeast was present in the sample.  In that study, room temperature specimens inoculated with yeast showed no fermentation at two days.  Uninoculated specimens that had sodium fluoride had no alcohol after 35 days.  He disagreed with Stumbaugh that the upper limit on the amount of fermentation that could occur in a sample is 0.02 percent; he had seen reports of 0.20 percent.  There was no way to say what amount of fermentation occurred in a sample held unrefrigerated for 10 hours without retesting the sample that tested 0.23 percent.  Based on his study, however, he would not expect to see significant fermentation in a sample that was not refrigerated for 10 hours and removed from refrigeration for one 30-minute period prior to testing four days later.

In Mark's study, samples that tested negative for alcohol at the start but demonstrated fermentation later looked and smelled perfectly normal.

Mark expected that a person with a 0.20 percent BAC would show significant symptoms of intoxication, even if that person were highly tolerant of alcohol.  He disagreed with Mr. Posey's opinion that at 0.15 percent BAC, all persons are too impaired to drive safely.  Mark believed that level was reached at 0.10 percent.  Mark believed  that for a 185-pound man to have a 0.20 percent BAC reading at 12:35 a.m., he would have had to consume 17 drinks between 7:30 p.m. and 9:30 p.m.  If that same man consumed four drinks in the same time period, his BAC at 9:50 p.m. would be no higher

14

than 0.03 percent. If a person consumed 17, 18, or 19 drinks in an afternoon before arriving somewhere, Mark would not expect that person to be obviously intoxicated.

## DISCUSSION

### I. *Substantial Evidence Supports Defendant's Murder Conviction*

Defendant argues the evidence adduced at trial is insufficient to support his conviction for second degree murder. "[D]riving while intoxicated is an act which may support a conviction for second degree murder under an implied malice theory. . . . ' "One who willfully consumes alcoholic beverages to the point of intoxication, knowing that he thereafter must operate a motor vehicle, thereby combining sharply impaired physical and mental faculties with a vehicle capable of great force and speed, reasonably may be held to exhibit a conscious disregard of the safety of others." ' " (*People v. Ferguson* (2010) 194 Cal.App.4th 1070, 1081, quoting from *People v. Watson* (1981) 30 Cal.3d 290, 300-301 (*Watson*).)

Post-*Watson* cases affirming drunk-driving murder convictions "have relied on some or all of the following factors in upholding such convictions: (1) a blood-alcohol level above the .08 percent legal limit; (2) a predrinking intent to drive; (3) knowledge of the hazards of driving while intoxicated; and (4) highly dangerous driving." (*People v. Autry* (1995) 37 Cal.App.4th 351, 358.) Defendant acknowledges *Watson* does not require that all of these factor be present to sustain a conviction of vehicular second degree murder (*People v. Olivas* (1985) 172 Cal.App.3d 984, 988-989), and he concedes the evidence demonstrates a predrinking intent to drive and knowledge of the hazards of driving while intoxicated, but he disputes there is sufficient evidence to show a BAC above 0.08 percent and highly dangerous driving. We disagree.

We set forth the familiar rules which govern our analysis of defendant's argument. In reviewing a claim of insufficiency of the evidence on appeal, " 'the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a

reasonable doubt.' " (*People v. Johnson* (1980) 26 Cal.3d 557, 576, quoting *Jackson v. Virginia* (1979) 443 U.S. 307, 318-319.) "An appellate court must view the evidence in the light most favorable to respondent and presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." (*People v. Reilly* (1970) 3 Cal.3d 421, 425; accord, *People v. Pensinger* (1991) 52 Cal.3d 1210, 1237.)

An appellate court does not reweigh the evidence or resolve factual conflicts in the evidence, "for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends." (*People v. Huston* (1943) 21 Cal.2d 690, 693, overruled on other grounds in *People v. Burton* (1961) 55 Cal.2d 328, 352.) " 'If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant reversal of the judgment. [Citations.]' [Citation.]" (*People v. Thomas* (1992) 2 Cal.4th 489, 514.)

"Malice is implied when the killing is proximately caused by ' "an act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life." ' " (*People v. Knoller* (2007) 41 Cal.4th 139, 143.) "[A] finding of implied malice depends upon a determination that the defendant *actually appreciated* the risk involved, i.e., a *subjective* standard." (*Watson*, *supra*, 30 Cal.3d at pp. 296-297.) In our view, the trial record contains ample evidence from which a rational jury could conclude defendant acted with implied malice.

Although defendant aggressively challenged the prosecution's experts on the reliability of defendant's BAC by presenting its own experts, ultimately it was for the jury to decide which experts were more convincing. "To warrant the rejection of the statements given by a witness who has been believed by a [fact finder], there must exist either a physical impossibility that they are true, or their falsity must be apparent without

16

resorting to inferences or deductions." (*People v. Huston, supra,* 21 Cal.2d at p. 693, overruled on other grounds in *People v. Burton, supra,* 55 Cal.2d at p. 352.) Defendant has not demonstrated the expert testimony presented by the prosecution on blood collection and analysis, the effects of alcohol and cocaine on the human nervous system, accident reconstruction, or unintended acceleration was apparently false or so unreliable as to be physically impossible. If believed by the jury, as they obviously were, the prosecution's expert witnesses established that defendant's BAC was over the legal limit and that his driving was thereby impaired.

Further, the lay witness testimony established that defendant's reckless driving consisted of more than speeding. Witnesses also testified to near-collisions with their cars, collisions with the curb and a tree, veering across lanes, and running a red light. Defendant's girlfriend testified that after dinner she took the car keys from defendant and gave them to the passenger. A paramedic and a police officer testified that defendant smelled of alcohol and had bloodshot and watery eyes. Defendant admitted alcohol consumption.

Evidence was presented that defendant knew of the dangers of drinking and driving and it did not deter him. The jury was instructed that testimony about defendant's three prior incidents of drinking and driving, if believed, could be considered for the limited purpose of proving that defendant knew of the dangerousness of drinking and negligent driving. Combined with testimony that he attended two programs designed to educate him about the dangers of drinking and driving, including causing a vehicular homicide, the evidence demonstrates defendant was subjectively aware of the risk to life he posed by drinking and driving, and that he consciously disregarded it. Finally, if the jury believed defendant refused to submit to a blood test, that evidence tended to show "he was aware of his guilt." (CALCRIM No. 2130.) Given the entirety of the picture presented by the evidence, a rational jury was entitled to conclude defendant had drunk more than two beers and a glass of wine with dinner that day, the 0.20 percent BAC

17

accurately reflected his state of alcohol intoxication, his driving was thereby impaired, and he knew and subjectively appreciated the dangers of drinking and driving but chose to drink and drive, despite the risk to life. In short, the evidence supports the jury's murder verdict.

## II. *The Motion to Suppress Defendant's Blood-Alcohol Result was Properly Denied*

Relying on *Schmerber v. California* (1966) 384 U.S. 757 (*Schmerber*) and *Missouri v. McNeely* (2013) __U.S. __ [133 S. Ct. 1552] (*McNeely*), defendant argues on appeal that his motion to suppress the evidence of his 0.20 percent BAC and his refusal to take a blood test should have been granted because the prosecution did not show that exigent circumstances excused the police from getting a warrant. As a result, both the murder and manslaughter convictions must be reversed. We disagree. As we explain below, the argument fails on several grounds. First, defendant did not rely on this argument below and has forfeited it on appeal. Second, defense counsel was not derelict for failing to argue lack of exigency because such an argument lacked merit.

### A. *Standard of Review*

In reviewing the trial court's denial of a motion to suppress evidence under Penal Code section 1538.5, we defer to the trial court's express and implied factual findings if they are supported by substantial evidence (*People v. Woods* (1999) 21 Cal.4th 668, 673), and indulge all inferences in favor of the court's order. (*People v. Brown* (1990) 216 Cal.App.3d 1442, 1447.) We exercise independent judgment to determine whether, based on the facts found by the trial court, the search was lawful. (*People v. Woods, supra,* at pp. 673-674.)

### B. *Schmerber and McNeely Decisions*

In *Schmerber, supra*, 384 U.S. 757, "[p]etitioner and a companion had been drinking at a tavern and bowling alley. There was evidence showing that petitioner was driving from the bowling alley about midnight November 12, 1964, when the car skidded, crossed the road and struck a tree. Both petitioner and his companion were

injured and taken to a hospital for treatment." (*Id.* at p. 758, fn. 2.) "The police officer who arrived at the scene shortly after the accident smelled liquor on petitioner's breath, and testified that petitioner's eyes were 'bloodshot, watery, sort of a glassy appearance.' The officer saw petitioner again at the hospital, within two hours of the accident. There he noticed similar symptoms of drunkenness. He thereupon informed petitioner 'that he was under arrest . . .' " (*id.* at pp. 768-769), while petitioner was receiving treatment for his injuries. "At the direction of a police officer, a blood sample was then withdrawn from petitioner's body by a physician at the hospital" (*id.* at p. 758) "according to accepted medical practices." (*Id.* at p. 771.)

On these facts, the Supreme Court rested two distinct holdings. First: "The officer in the present case . . . might reasonably have believed that he was confronted with an emergency, in which the delay necessary to obtain a warrant, under the circumstances, threatened 'the destruction of evidence,' [citation]. We are told that the percentage of alcohol in the blood begins to diminish shortly after drinking stops, as the body functions to eliminate it from the system. *Particularly in a case such as this, where time had to be taken to bring the accused to a hospital and to investigate the scene of the accident, there was no time to seek out a magistrate and secure a warrant.* Given these special facts, we conclude that the attempt to secure evidence of blood-alcohol content in this case was an appropriate incident to petitioner's arrest." (*Schmerber, supra,* 384 U.S. at pp. 770-771, italics added.)

Second: "[W]e are satisfied that the test chosen to measure petitioner's blood-alcohol level was a reasonable one. Extraction of blood samples for testing is a highly effective means of determining the degree to which a person is under the influence of alcohol. [Citation.] Such tests are a commonplace in these days of periodic physical examination and experience with them teaches that the quantity of blood extracted is minimal, and that for most people the procedure involves virtually no risk, trauma, or pain. . . . [¶] Finally, the record shows that the test was performed in a reasonable

19

manner. . . . We are thus not presented with the serious questions which would arise if a search involving use of a medical technique, even of the most rudimentary sort, were made by other than medical personnel or in other than a medical environment—for example, if it were administered by police in the privacy of the stationhouse. To tolerate searches under these conditions might be to invite an unjustified element of personal risk of infection and pain." (*Id.* at pp. 771-772, fn. omitted.)

*McNeely, supra*, __U.S. __ [133 S. Ct. 1552], involved a "routine DWI case." (*Id.* at p. 1557.) A police officer stopped the defendant's truck at 2:08 a.m. on the highway after observing it speeding and repeatedly crossing the centerline. (*Id*. at p. 1556.) The officer noticed defendant had bloodshot eyes, slurred speech, the smell of alcohol on his breath, and difficulty getting out of his truck. Defendant admitted having "a couple of beers" at a bar. Defendant was arrested after failing a number of field sobriety tests and refusing to take a breath test to measure his BAC. (*Id.* at p. 1557.) The officer was on his way to the stationhouse with defendant but changed course and took defendant to a nearby hospital for blood testing after defendant again refused to take a breath test. The officer did not attempt to get a warrant. (*Ibid*.) Once at the hospital, the officer asked defendant if he would consent to a blood test and read him the standard implied consent form which explained his refusal to submit to testing could be used against him in a future prosecution and would in any event immediately lead to a one-year revocation of his driver's license. After defendant refused, the officer directed a lab technician to take a blood sample, which was done at 2:35 a.m. (*Ibid*.) The trial court granted defendant's motion to suppress the results of the blood test for lack of a warrant or exigent circumstances to excuse getting one, and the state Supreme Court affirmed. (*Ibid*.) The question before the United States Supreme Court was "whether the natural dissipation of alcohol in the bloodstream establishes a *per se* exigency that suffices on its own to justify an exception to the warrant requirement for nonconsensual blood testing in drunk-driving investigations." (*Id.* at p. 1558.) The Supreme Court affirmed, declining to create a

20

categorical exception to the warrant requirement for blood testing in drunk-driving cases on account of the "inherently evanescent" quality of BAC evidence. (*Id.* at pp. 1558, 1560.)

Instead, the court reaffirmed its commitment to a "totality of the circumstances" approach to determine "whether a law enforcement officer faced an emergency that justified acting without a warrant." (*McNeely, supra*, __U.S. at p. __ [133 S. Ct. at p. 1559].) While acknowledging that "improvements in communications technology do not guarantee that a magistrate judge will be available when an officer needs a warrant after making a late-night arrest," it made clear that "technological developments that enable police officers to secure warrants more quickly, and do so without undermining the neutral magistrate judge's essential role as a check on police discretion, are relevant to an assessment of exigency. That is particularly so in this context, where BAC evidence is lost gradually and relatively predictably." (*Id.* at pp. 1652-1653.)

The technological advances referenced in *McNeely* were not part of the evidentiary landscape in 1966 when *Schmerber* was decided. Nevertheless, the Court went out of its way to reaffirm that the *facts* in *Schmerber* demonstrated the existence of exigent circumstances. "In short, while the natural dissipation of alcohol in the blood may support a finding of exigency in a specific case, *as it did in Schmerber,* it does not do so categorically. Whether a warrantless blood test of a drunk-driving suspect is reasonable must be determined case by case based on the totality of the circumstances." (*McNeely, supra*, __U.S. at p. __ [133 S. Ct. at p. 1563], italics added.)

C. *Defendant's Contentions Below and on Appeal*

In the trial court, defendant argued the officer's conduct violated the Fourth Amendment in that drawing defendant's blood over his refusal to consent to the procedure unreasonably interfered with his access to "ongoing emergency medical

21

treatment" for "15 minutes" while he was "obviously [in] severe pain, and being treated for severe injuries."[2] Defendant does not renew that argument here.

Instead, defendant argues on appeal the officer was required to secure a warrant before getting a blood sample from defendant because exigent circumstances were not shown to exist, an argument he did not make below. "Objections not presented to the trial court cannot be raised for the first time on appeal." (*In re Michael L.* (1985) 39 Cal.3d 81, 88.) Ordinarily, parties are not permitted "to assert a new theory on appeal to support or defeat the trial court's suppression ruling" (*Green v. Superior Court* (1985) 40 Cal.3d 126, 137) if the lack of notice of the new theory robs the other side of the "opportunity to present evidence in opposition." (*Id.* at p. 138.) That is the situation here. By failing to challenge the blood draw below on the ground the police could have obtained a warrant and therefore lacked exigent circumstances, defendant has waived direct appellate review of the exigent circumstances issue.

Anticipating our ruling, defendant opts to circumvent it by arguing trial counsel was ineffective for failing to raise the issue below or "develop[] the necessary facts through investigation and the presentation of evidence that Duren or her colleagues had plenty of time to obtain a search warrant but failed to do so." We disagree.

"In order to prevail [on an ineffective assistance of counsel claim], the defendant must show both that counsel's representation fell below an objective standard of reasonableness, [citation] and that there exists a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. [Citation.] Where defense counsel's failure to litigate a Fourth Amendment claim competently is the principal allegation of ineffectiveness, the defendant must also prove that his Fourth Amendment claim is meritorious and that there is a reasonable probability

---

[2] Defendant filed two written motions to suppress, one before each trial. As defendant acknowledges, both motions were "essentially the same."

22

that the verdict would have been different absent the excludable evidence in order to demonstrate actual prejudice." (*Kimmelman v. Morrison* (1986) 477 U.S. 365, 375.)

Defendant's argument fails because he cannot show a motion to suppress based on the lack of exigent circumstances would have been meritorious. The facts of this case are eerily similar to the facts in *Schmerber* and a far cry from the routine DUI arrest in *McNeely* – which had not been decided at the time of defendant's renewed motion to suppress in August 2011. Like *Schmerber* and unlike *McNeely*, defendant's car hit a tree, causing an accident in which he and his passenger were injured, except here the passenger's injuries were fatal. Police and paramedics were dispatched to the scene of the accident at 9:53 p.m.[3] The passenger had to be extracted from the upside-down car with the Jaws of Life. Defendant admitted to a paramedic (who told Officer Duren) that he had been drinking alcohol that evening. Defendant was taken to the hospital by ambulance for treatment while police remained on the scene to direct traffic and conduct a DUI and homicide investigation. Officer Duren knew there would be no breath testing equipment available at the hospital and that defendant was in no condition to be breath-tested; she called a county phlebotomist to meet her at the hospital. Officer Duren arrived at the hospital at 11:42 p.m. and spoke with the paramedics at 11:58 p.m. By the time she obtained permission to speak with defendant in the emergency room, two hours and 10 minutes had elapsed since the accident report. Officer Duren then *Mirandized* defendant and questioned him about the accident; she also tried to find out if defendant would consent to a blood test. At first, defendant acquiesced, but as she questioned him further to ascertain whether he understood what she was saying, and defendant became more alert, his acquiescence hardened into refusal. The blood draw began at 12:35 a.m., more than two and a half hours after the accident report.

---

[3] The facts are drawn from Officer Duren's testimony at the motion to suppress prior to the first trial. She did not testify again at the renewed motion prior to the second trial.

In our view, under the totality of these circumstances, "[t]he officer in the present case . . . might reasonably have believed that [she] was confronted with an emergency, in which the delay necessary to obtain a warrant, under the circumstances, threatened 'the destruction of evidence.' " (*Schmerber, supra*, 384 U.S. at p. 770.) Defendant's injuries – not his refusal of a breath test, as in *McNeely* – necessitated taking him to the hospital for treatment. The officer had no control over how long the investigation at the scene of the homicide would take, or what shape defendant would be in when she got to the hospital to continue her investigation. She had no reason to believe at the time she called the phlebotomist that defendant would later refuse to consent to a blood test. In fact, he did appear to consent, at first. It was not until defendant refused the blood test, more than two and a half hours after the accident, that the issue of a warrant would have arisen. At that point, the evidence was already disappearing at an alarming rate, and no technological advancement could "guarantee that a magistrate judge will be available when an officer needs a warrant after making a late-night arrest." (*McNeely, supra*, __U.S. at p. __ [133 S. Ct. at p. 1562].) Given the law and these facts, defendant's argument -- that exigent circumstances did not exist -- lacks merit. Therefore, his ineffective assistance of counsel claim, too, must fail.

## III. *The Jury Correctly Did Not Learn of Defendant's Manslaughter Conviction*[4]

Defendant argues the trial court should have informed the jury (1) he was originally charged with murder and gross vehicular manslaughter; (2) he was convicted of gross vehicular manslaughter; (3) the first jury could not reach a verdict on the murder charge; (4) at the second trial, the jury could not consider the earlier verdict for any

---

[4] After briefing was completed, defendant requested augmentation of the appellate record with two volumes of reporter's transcripts of voir dire. These show the prospective jurors were informed defendant was in custody for something related to the pending trial; they were not going to learn anything more about the reasons for his custodial status; and they were not to consider defendant's custodial status for any purpose in the upcoming trial. We grant defendant's request for augmentation; however, the voir dire does not change our analysis of defendant's claim or our conclusion no error occurred.

24

purpose; and (5) if they could reach a verdict in this trial, it would not affect the manslaughter verdict. [5] The trial court declined to so inform the jury, deciding it was "cleaner" to simply refer to the first trial as a "prior proceeding."

Defendant contends the trial court's failure to instruct the jury on the outcome of the first trial deprived him of due process in that it gave the prosecutor an "unfair advantage" by allowing him to present the jury with the "all or nothing" choice of convicting him of murder or acquitting him. In essence, defendant's position is that he would have had a better chance of winning an acquittal of murder if the jury knew he would be punished anyway for gross vehicular manslaughter.

Defendant also claims the prosecutor committed misconduct and violated the equitable doctrine of judicial estoppel by taking incompatible positions to gain an unfair advantage at the second trial. (*People v. Castillo* (2010) 49 Cal.4th 145, 155.) And, he asserts the prosecutor committed misconduct by telling the jury in his rebuttal portion of his closing argument that defendant was hoping the jury would "let him walk away from a murder charge." We disagree.

We first address whether the trial court abused its discretion in excluding evidence of the outcome of the first trial. (*People v. Rodriguez* (1999) 20 Cal.4th 1, 9-10.) In California, "[n]o evidence is admissible except relevant evidence." (Evid. Code, § 350; see also § 351; Cal. Const., art. 1, § 28, subd. (f)(2) [all relevant evidence admissible with certain exceptions]) " 'Relevant evidence' means evidence . . . having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.) "The test of relevance is whether the evidence tends

---

[5] Defendant proposed the following instruction: "Mr. Walker was originally charged in this case with gross vehicular manslaughter and second degree murder arising from the incident leading to the death of Dan White. In an earlier trial, Mr. Walker was convicted of gross vehicular manslaughter, but the jury could not reach a verdict on the second degree murder charge. . . . You are hereby instructed that you may not consider that earlier verdict for any purpose in determining the issues in this trial. You are also instructed that your verdict in this case, if one can be reached, will not affect that earlier verdict in any way."

'logically, naturally, and by reasonable inference' to establish material facts such as identity, intent, or motive. [Citations.] The trial court retains broad discretion in determining the relevance of evidence." (*People v. Garceau* (1993) 6 Cal.4th 140, 177, disapproved on other grounds in *People v. Yeoman* (2003) 31 Cal.4th 93, 117-118.) The fact that at the first trial defendant was convicted of manslaughter, and that the jury was unable to reach a verdict on the murder charge, was not relevant to any disputed issue in the subsequent murder trial. By not informing the jury of the conviction and mistrial, the court guarded against distracting the jury from its task with musings about penalty, and the consequent possibility of jury nullification. The trial court did not abuse its discretion in excluding those facts from the jury's consideration.

Assuming defendant's due process argument was subsumed under and preserved by his other objections (*People v. Partida* (2005) 37 Cal.4th 428, 435), it nevertheless lacks merit. Application of the ordinary rules of evidence does not impermissibly infringe on a defendant's due process rights. (*People v. Boyette* (2002) 29 Cal.4th 381, 427-428.)

Defendant's judicial estoppel and prosecutorial misconduct claims also fail. He did not argue violation of the equitable doctrine of judicial estoppel below, nor did he object to the prosecutor's comment during closing argument. Arguably, he has forfeited those claims of error on appeal. (Evid. Code, § 354, subd. (a); *People v. Raley* (1992) 2 Cal.4th 870, 892; *People v. Hill* (1998) 17 Cal.4th 800, 820-821.) In any event, neither claim has merit.

The prosecutor did not adopt "wholly inconsistent" positions at the first and second trials. (*People v. Castillo, supra*, 49 Cal.4th at p. 155.) "Section 954 sets forth the general rule that defendants may be charged with and convicted of multiple offenses based on a single act or an indivisible course of conduct. It provides in relevant part: 'An accusatory pleading may charge two or more different offenses connected together in their commission, or *different statements of the same offense* . . . . The prosecution is not

required to elect between the different offenses or counts set forth in the accusatory pleading, but the defendant may be convicted of any number of the offenses charged . . . .' " (*People v. Pearson* (1986) 42 Cal.3d 351, 354, italics added.) Nevertheless, "multiple convictions may *not* be based on necessarily included offenses." (*Id*. at p. 355.)

Gross vehicular manslaughter, however, is not a lesser included offense of murder. (*People v. Sanchez* (2001) 24 Cal.4th 983, 987-991; disapproved on a different point in *People v Reed* (2006) 38 Cal.4th 1224, 1227-1228.) As the *Sanchez* court explained: "Although as a factual matter, a murder may be carried out by means of a vehicle and by an intoxicated driver, in the abstract it obviously is possible to commit a murder without committing gross vehicular manslaughter while intoxicated. Accordingly, dual conviction in the present case was appropriate — although the trial court properly avoided dual punishment pursuant to section 654 by staying execution of sentence for the vehicular manslaughter offense." (*Id.* at p. 988.)

Accordingly, the prosecutor committed no wrongdoing in charging defendant with both murder and gross vehicular manslaughter. Nor did he adopt inconsistent positions, or gain any unfair advantage, by deciding to retry defendant for murder after the first jury was unable to reach a verdict. Defendant relies by analogy on cases involving the court's duty to instruct on lesser *included* offenses shown by the evidence (*People v. Barton* (1995) 12 Cal.4th 186, 196 [" '[o]ur courts are not gambling halls' "]; *Beck v. Alabama* (1980) 447 U.S. 625), or implicating double jeopardy concerns after a first jury's conviction on a lesser included offense is improperly recorded and leads to a second trial on the greater offense. (*People v. Fields* (1996) 13 Cal.4th 289.) At most, these cases demonstrate that juries should be properly instructed as to lesser included offenses, and verdicts on lesser included offenses should not be recorded where no verdict has been reached on the greater offense. But these cases do not demonstrate that the prosecution abuses its charging discretion by including murder and gross vehicular manslaughter in

27

the same accusatory pleading, or by opting to retry a mistried count. Nor do those cases suggest a prosecutor violates equitable principles by opposing the defense's request to inform the second jury of the first jury's mixed verdict.

Similarly, the prosecutor's unobjected-to comment during closing argument did not misstate the law or the facts. Even if we assumed error, given the evidence adduced at trial and the court's instructions, there is no reasonable probability the jury would have returned a result more favorable to defendant in the absence of the comment. (*People v. Watson* (1956) 46 Cal.2d 818, 836.)

## IV. *The Jury Was Correctly Instructed on Implied Malice*

Defendant contends the implied malice instruction given here, CALCRIM no. 520, is internally inconsistent in that it tells the jury, on the one hand, that the defendant acts with implied malice when he *deliberately* acts with conscious disregard for human life, and on the other hand, that malice does *not* require *deliberation.*[6] He argues the latter sentence cancels out the former and violated due process by effectively removing one of the four constituent elements of implied malice from the jury's purview, thereby relieving the prosecution of its burden of proving defendant acted with implied malice. (*Estelle v. McGuire* (1991) 502 U.S. 62, 72; but see *People v. Cummings* (1993) 4 Cal.4th 1233, 1314 [harmless error analysis applies to misinstruction on one element or one aspect of

---

[6] As given here, CALCRIM no. 520 provided in relevant part:
"The defendant is charged . . . [with] murder in violation of Penal Code section 187. [¶] To prove that the defendant is guilty of this crime, the People must prove that: One, the defendant committed an act that caused the death of another person; and, two, when the defendant acted, he had a state of mind called 'malice aforethought.' [¶] There are two kinds of malice aforethought, express malice and implied malice. Proof of either is sufficient to establish the state of mind required for murder. [¶] The defendant acted with express malice aforethought if he unlawfully intended to kill. The defendant acted with implied malice if, one, he intentionally committed an act; two, the natural and probable consequences of the act were dangerous to human life; three, at the time that he acted, he knew his act was dangerous to human life; and, four, *he deliberately acted with conscious disregard for human life.* [¶] Malice aforethought does not require hatred or ill will toward the victim. It is a mental state that must be formed before the act that causes death is committed. *It does not require deliberation or the passage of any particular period of time.*" (Italics added.)

28

an element]; *People v. Mil* (2012) 53 Cal.4th 400, 413-414 [reaffirming principle].) We disagree.

We review defendant's challenge to the implied malice instruction in light of well-settled principles. "We conduct independent review of issues pertaining to instructions." (*People v. Cooksey* (2002) 95 Cal.App.4th 1407, 1411, citing *People v. Waidla* (2000) 22 Cal.4th 690, 733, 737.) When the defendant challenges the adequacy of the instruction as ambiguous or potentially misleading, our principle task is to determine "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that violates the Constitution" or California law. (*People v. Ayala* (2000) 24 Cal.4th 243, 289, internal quotation marks omitted; *Estelle v. McGuire, supra,* 502 U.S. at p. 72; *People v. Clair* (1992) 2 Cal.4th 629, 662-663.) We determine the correctness of the challenged instruction "in the context of the instructions as a whole and the trial record," and not " 'in artificial isolation.' " (*Estelle v. McGuire, supra,* 502 U.S. at p. 72.) Thus, for example, " ' "[t]he absence of an essential element in one instruction may be supplied by another or cured in light of the instructions as a whole." ' " (*People v. Musselwhite* (1998) 17 Cal.4th 1216, 1248.)

At trial, defendant requested an instruction that would have defined "deliberately acted" in terms drawn from the first degree murder instruction on premeditation and deliberation.[7] The court correctly rejected defendant's proposed instruction. "Deliberate intent . . . is not an essential element of murder, as such. It is an essential element of one class only of first degree murder and is not at all an element of second degree murder." (*People v. Valentine* (1946) 28 Cal.2d 121, 131-132.) "Malice aforethought as required in second degree murder is not synonymous with the term deliberate as used in defining first

---

[7] The requested instruction stated: "Defendant acted deliberately if he carefully weighed the considerations for and against his choice and, knowing the consequences, decided to perform the act that was dangerous to human life. [¶] Malice aforethought does not require hatred or ill will toward the victim. It is a mental state that must be formed before the act that causes death is committed. It does not require the passage of any particular period of time." (See CALCRIM No. 521.)

degree murder. [Citation.] To hold otherwise would obliterate the distinction between the two degrees of murder." (*People v. Washington* (1976) 58 Cal.App.3d 620, 624.)

Defendant also requested the court leave out the phrase "does not require deliberation," so that the last sentence of the instruction would read: "It [malice aforethought] does not require the passage of any particular period of time." The court correctly rejected this request as well.

Instructional definitions of malice aforethought using the language to which defendant objects have long been approved by the California Supreme Court. For example, in *People v. Dellinger* (1989) 49 Cal.3d 1212, 1222, our Supreme Court approved the 1983 Revision (4th ed. 1983 supp.) and the 1988 Revision (5th ed. 1988) of CALJIC no. 8.11, both of which, like the 2013 version, conclude: "The word 'aforethought' *does not imply deliberation* or the lapse of considerable time. It only means that the required mental state must precede rather than follow the act." (*Id.* at pp. 1221-1222 & fn. 1, italics added.) In *People v. Knoller, supra,* 41 Cal.4th 139, the Court re-approved CALJIC no. 8.11 and approved CALCRIM no. 520, the instruction at issue here. (*Id.* at p. 152.) Although the *Dellinger* and *Knoller* opinions did not focus on the phrase to which defendant objects, we think it highly unlikely the Court would have approved instructions that contained glaring inconsistencies.

Moreover, we find no basis in the record to conclude the jurors were confused, and see no reasonable likelihood any jurors applied the challenged instruction in a way that allowed them to conclude defendant had implied malice *without* a conscious disregard of for human life. To paraphrase a different court, " 'How can an individual [consciously] disregard a fact without having [deliberately] regarded it in the first instance?' " (*Dellinger, supra*, 49 Cal.3d at p. 1220, quoting from *People v. Benson* (1989) 210 Cal.App.3d 1223, 1230, fn. 4.)

In addition to correctly instructing on the components of implied malice, the court also instructed the jury that if some words or phrases used during the trial had a legal

meaning different from the meanings in everyday use, they would be specifically instructed on those meanings; otherwise, "[w]ords and phrases . . . are to be applied using their ordinary everyday meaning." Likewise, the jury was instructed (twice) not to "use a dictionary, the Internet, or reference materials," and to follow the law as explained by the court, even if the jury disagreed with it, and even "[i]f you believe that the attorneys' comments on the law conflict with my instructions . . . ." The jurors were also instructed at the start of trial: "Nothing that the attorneys say is evidence. In their opening statements and closing arguments, the attorneys will discuss the case, but their remarks are not evidence." In our view, these instructions taken as a whole were sufficient to put the attorneys' dueling dictionary definitions of "deliberately" during closing arguments in their proper perspective for the jury. We conclude that viewed "in the context of the instructions as a whole and the trial record," and not " 'in artificial isolation,' " there was no instructional ambiguity. (*Estelle v. McGuire, supra,* 502 U.S. at p. 72.)

## V. *The Motion for New Trial Was Properly Denied*

Defendant argues the trial court erroneously denied his motion for new trial based on jury misconduct during deliberations. He contends the evidence presented at the hearing on his motion established that one juror voted for a guilty verdict because she was concerned defendant would reoffend if acquitted and, if he did, she couldn't live with herself. The trial court found no misconduct or prejudice had been established and denied the motion. We find no error, and reject defendant's argument as well.

### A. *Factual Background*

After eight days of testimony, jury deliberations began on September 28, 2011 at 4:25 p.m. and ended for the day five minutes later. On Thursday, September 29, 2011, after 3:25 p.m., the court received two missives from the jury enquiring about cocaethylene and driving under the influence. The court responded to both inquiries, and the jury continued to deliberate on Friday, September 30. On Monday, October 3, juror no. 7 (JN7), the foreperson, informed the bailiff before lunch that juror no. 2 (JN2) told

31

the jury she had done some research over the weekend about the definition of cocaethylene. The foreperson told JN2 not to share what she learned with the jury.

That afternoon, the court questioned JN2. She admitted "Googl[ing]" cocaethylene but said she didn't find anything. She wanted to know the "legal limit" for cocaine, "like alcohol, it's .08," but she could not find that information online. Asked if she remembered the admonition about not doing outside research, she replied, "I was not sure because each one of us had specific specialization and they brought knowledge which nobody else had." Asked if she told the other jurors what she found, she replied, "No, there was nothing. I found nothing."

The court then questioned the foreperson, JN7. He told the court that JN2 told the jurors she found some definitions on cocaethylene, but "[w]e all stopped her before she got [as] far" as telling them the definition. He added: "We wanted to make sure it was clear that everyone knew that there was no research to be done on any aspect of the case whatsoever." The court then brought JN2 back in and admonished her that she had violated the court's order to avoid going on the internet and avoid doing research. "I was very clear about not Googling. I even said, 'Don't Google it' . . . . By the fact that you violated the Court's order, I have to excuse you from the jury service." The court then substituted alternate juror no. 1 for JN2 and instructed the jury to begin deliberations anew. The jury returned its verdict the following day at 11:57 a.m.

On October 26, 2011, excused juror JN2 contacted the superior court judge by email in response to his letter inviting jurors to share their thoughts on the experience of being a juror in defendant's case. Her email stated: "I feel compelled to bring to your notice the fact that the majority of the jurors convicted the defendant thinking the only choices were 'guilty of second degree murder' and 'not guilty of anything'. [¶] Most of us were uncomfortable with declaring him guilty of second degree murder, but thought we did not have a choice since he was clearly guilty to a lesser degree. We thought if we said 'not guilty' he might go home and repeat his behavior. You had pointed out that that

32

was not going to happen, but it only made us think that he might be in jail for some other unrelated crime. [¶] To summarize my feedback, if the jurors had known that Mr. Walker had already been convicted of vehicular manslaughter, there is absolutely no way that he would have been convicted of second degree murder by this jury."

Contacted by a defense investigator by phone, removed JN2 added that, "during deliberations, jurors had specifically stated that they were concerned that they did not know how long Mr. Walker would remain in custody, and that if they failed to convict him, he could be released and be a danger to the community. She stated that such statements were 'definitely said' by members of the jury during deliberations. She also stated that more than one juror had made such statements." Former JN2 never signed a declaration repeating under oath the information outlined above.

Apparently juror no. 11 (JN11) also emailed the judge. This email is not part of the record on appeal, but it was disclosed to the attorneys. Later comments by the judge indicate JN11 took "umbrage of the fact that he views that I have no discretion in my sentencing. . . . And his frustrations demonstrate themselves in his initial E-mail, which I've provided to counsel, and I think began this process by which counsel brought forth this motion to receive the information of the jurors and their addresses and information, which was granted, and subsequently this current motion." The defense investigator contacted or interviewed, in addition to removed JN2, juror nos. 4, 8, 10, and 11. Alternate juror no. 1, who replaced the removed juror, stated she did not wish to cooperate with the defense.

JN11 submitted two declarations to the court. In the first declaration he stated "there were discussions among the jurors about the consequences of the two possible verdicts, second degree murder and not guilty. [¶] Some jurors stated that they were concerned that if we did not vote to convict defendant of murder, that he would be released and would not receive any punishment for this event and that he would be a danger to the public. [¶] One juror voiced her concern about the danger of defendant

33

being found not guilty in the following terms.  She stated that she lived in or near Burlingame, and she knew the area in which Mr. Walker's accident had occurred, and her children spent time in the bars in the Burlingame area.  She stated that if she voted not guilty, and defendant were released, and somebody got hurt because defendant drank and drove, then 'I would not be able to live with myself.'  This is how she 'made the case' for voting for guilty for murder.  [¶]  There were other jurors who voiced agreement when the above statements were made.  Nobody on the jury voiced any objection to these statements or argued that they were improper or should not be considered.  [¶]  These statements were made during deliberations before the jury had reached agreement to vote guilty for murder.  Prior to the final ballot in which the jury agreed to convict of murder, several jurors had stated that they had reservations about convicting of murder and were not ready to commit to voting for guilty of murder."

The prosecution submitted declarations from six jurors.  Four of the six had no recollection of any juror making any statement "that if the defendant were not convicted of murder that he would not receive any punishment" and would continue to endanger the public, or that the juror would not be able to live with herself if defendant were released and hurt someone else.  Two of the jurors, JN2 (the alternate who replaced the removed juror) and JN7, the foreperson, vaguely recalled a juror mentioning the consequences of the two possible verdicts – second degree murder and not guilty.  JN2 stated that comment was brief, and was made by a female juror at the very end of deliberations.  JN7 added that the comment was not discussed by the entire jury, which "was quickly redirected back to discussion of the evidence."

Both JN2 and JN7 also had a "vague recollection" of a juror saying that "if she voted not guilty and the Defendant were released and hurt someone else, she 'wouldn't be able to live with [her]self. ' "  JN7 thought this comment may have been connected to a "hypothetical situation," raised by that juror very early on in deliberations.  Neither JN2 nor JN7 had any recollection of that juror saying she was voting for a guilty verdict on

34

such a basis. Both described the comment as "off-hand." JN2's impression was that the comment was "about [the juror's] emotions surrounding the case" and it had no bearing on JN2's decision to vote for a guilty verdict. JN7 stated "no one else commented on that statement or agreed with it" and that the comment was "redirected by the other jurors." Neither JN2 nor JN7 had any recollection of any juror saying anything to the effect that he or she was voting "guilty" for sentencing reasons or out of concern that defendant, if released, would pose a danger to the public. JN7 specifically recalled the jury being instructed "not to consider sentencing or possible penalties in our deliberation."

In response to the prosecution's declarations, the defense submitted a second declaration from JN11, which said: "The statement I have described in my earlier declaration, in which one of the jurors stated that she was concerned that if defendant was found not guilty, he could be released, drink, drive, cause an accident and hurt someone, and in which she stated that she could not live with herself if that happened, was made by a female juror in the early or middle part of the deliberations. That juror was seated near to me at the jury table. . . . The foreman was seated at the other end of the table, at the end opposite from me. During our deliberations, there were sometimes more than one person talking. In addition, individual jurors, including the foreman, sometimes were up from their seats working on the blackboard while other jurors were speaking. When the juror made the statement described above, the jurors responded affirmatively to her statement and indicated their agreement with it. Jurors at the other end of the table may not have heard the statement or the affirmative reaction expressed by the jurors who did hear the statement."[8]

After hearing argument on the motion, the trial court observed the jury knew from voir dire that defendant "was in custody and [was] going to be in custody for quite some time regardless of the verdict," but was instructed not to consider penalty or punishment.

---

[8] JN11's declarations (Exhibits A and B) were not originally included in the record on appeal. This court requested them from the superior court on its own motion.

Adverting to JN11's "frustrations" with the court's perceived lack of sentencing options at which he took "umbrage" in an email, the court recalled that JN11's email prompted the new trial motion based on jury misconduct. The court continued: "I don't see misconduct here. I think that the vagaries made by (Juror No. 11) as to his comments don't rise to the level of misconduct. There's no basis for a hearing. There's no material conflicts that need to be addressed. I mean, if someone disagrees with my assessment that what is being said is a misconduct, then it certainly is not prejudicial. It just doesn't rise to that level. The vagaries of this are such that just does not take it to that level." The motion was denied.

**B.** *General Principles and Standard of Review*

"The right to unbiased and unprejudiced jurors is an inseparable and inalienable part of the right to a trial by jury guaranteed by the constitution." (*Lombardi v. California St. Ry. Co.* (1899) 124 Cal. 311, 317; accord, *People v. Nesler* (1997) 16 Cal.4th 561, 578; Cal. Const., art. 1, § 16; U.S. Const., 6th and 14th Amends.) A violation of that right through prejudicial jury misconduct is grounds for a new trial. (*People v. Blackwell* (1987) 191 Cal.App.3d 925, 929; Pen. Code, § 1181, subd. 3.)

"It is settled that in the trial of a criminal case the trier of fact is not to be concerned with the question of penalty, punishment or disposition in arriving at a verdict as to guilt or innocence." (*People v. Allen* (1973) 29 Cal.App.3d 932, 936, fn. omitted.) It is also misconduct to disregard the trial court's instructions, such as those given in this case, enjoining the jury from considering penalty or punishment. (*People v. Hill* (1992) 3 Cal.App.4th 16, 34, overruled on another point in *People v. Nesler, supra,* 16 Cal.4th at p. 582, fn. 5.)[9]

Jury misconduct may be established by jurors' declarations in a proper case. (See Evid. Code, § 1150; *Enyart v. City of Los Angeles* (1999) 76 Cal.App.4th 499, 506-507.)

---

[9] The jury was instructed: "You must reach your verdict without any consideration of punishment."

36

Declarations recounting statements, conduct, or events "open to sight, hearing, and the other senses and thus subject to corroboration" are admissible to establish juror misconduct. (*People v. Hutchinson* (1969) 71 Cal.2d 342, 350.) Declarations submitted as proof of an individual juror's subjective reasoning processes, which can be neither corroborated nor disproved, are not. (*Krouse v. Graham* (1977) 19 Cal.3d 59, 81.)

To prevail on a claim of jury misconduct, the complaining party must show both misconduct and resulting prejudice. "Prejudice exists if it is reasonably probable that a result more favorable to the complaining party would have been achieved in the absence of the misconduct." (*Hasson v. Ford Motor Co.* (1982) 32 Cal.3d 388, 415.) Admissible proof of jury misconduct generally raises a presumption of prejudice that may be rebutted by proof that no prejudice actually resulted. (*In re Hitchings* (1993) 6 Cal.4th 97, 118-119; *People v. Mendoza* (2000) 24 Cal.4th 130, 195; see also *Hasson v. Ford Motor Co., supra,* 32 Cal.3d at p. 416 & fn. 9.)

In ruling on a motion for a new trial based on juror misconduct, the court first determines if misconduct occurred and second, if it finds misconduct, whether the misconduct affected the verdict. On the first question, "[w]e accept the trial court's credibility determinations and findings on questions of historical fact if supported by substantial evidence. [Citations.]" (*People v. Nesler, supra,* 16 Cal.4th at p. 582.) The second question, "[w]hether prejudice arose from juror misconduct . . . is a mixed question of law and fact subject to an appellate court's independent determination." (*Ibid.*)

## C. *Analysis*

In this case, the trial court made a preliminary determination that no misconduct occurred. The court arrived at this conclusion after consideration of the declarations of JN11 on the one hand, and JN2 and JN7 on the other. If believed, the declarations of JN2 and JN7 established that any comments made were brief, and were not discussed or endorsed by any member of the jury. Furthermore, the unidentified juror's statement to

37

the effect that she would not be able to live with herself if defendant were acquitted, released, and hurt someone else did not establish that she voted "guilty" for *that* reason, rather than the strength of the evidence. Not even JN11's declarations alleged she told the other jurors she was voting guilty for that reason. Significantly, both JN11 and JN7 recalled the comment was made early on in deliberations, presumably before the jury had delved very deeply into its review of the evidence and the law, and before the individual jurors had formed any hard and fast opinions.

While it is true that considerations of punishment have no place in jury deliberations about guilt, it is also true that "[j]urors, in common with people in general, are aware of the meanings of verdicts of guilty and not guilty. It is common knowledge that a verdict of not guilty means that the prisoner goes free and that a verdict of guilty means that he is subject to such punishment as the court may impose." (*Lyles v. United States* (D.C. Cir. 1957) 254 F.2d 725, 728, overruled in part by *U.S. v. Brawner* (D.C. Cir. 1972) 471 F.2d 969, 996.) As two examples from a related context illustrate, a jury's fleeting discussion of punishment does not necessarily establish that prejudicial misconduct affecting the verdict has occurred. In *People v. Riel* (2000) 22 Cal.4th 1153, one juror told another during the penalty phase of a capital case, "If we give him the death penalty, the judge will just commute it to life in prison anyway." (*Id.* at p. 1218.) Our Supreme Court observed that the juror's prediction was "merely the kind of comment that is probably unavoidable when 12 persons of widely varied backgrounds, experiences, and life views join in the give-and-take of deliberations. Not all comments by all jurors at all times will be logical, or even rational, or, strictly speaking, correct. But such comments cannot impeach a unanimous verdict; a jury verdict is not so fragile." (*Id.* at p. 1219.) Similarly, in *People v. Schmeck* (2005) 37 Cal.4th 240, our Supreme Court rejected a jury misconduct claim where "the jurors briefly discussed the possibility that defendant would be released despite any verdict of life imprisonment without the

possibility of parole." (*Id.* at p. 307, abrogated on another point in *People v. McKinnon* (2011) 52 Cal.4th 610, 637-638.)

Here, the question whether an unidentified juror's comment was a fleeting, off-hand comment about her emotions not shared by the jury as a whole and not discussed by them, as described by JN7 and JN2, or something more sinister, as described by JN11, was one of relative credibility. The court had reason to find the foreperson's declaration trustworthy, based on the court's firsthand observation of the foreperson's forthright dealings with the jury and the court over the matter of the juror who Googled cocaethylene. JN11, on the other hand, seemed to have some axe to grind about punishment, as expressed in his email to the court.

This court cannot disregard the trial court's determination that the declarations by JN2 and JN7 were more credible than those by JN11. "[W]e afford deference to the trial court's factual determinations, based, as they are, on firsthand observations unavailable to us on appeal." (*People v. Barnwell* (2007) 41 Cal.4th at p. 1053 [discharge of sitting juror].) Based on its determination that JN2 and JN7 were credible, substantial evidence supports the trial court's finding that no misconduct occurred. In any event, we independently conclude that the unidentified juror's comments could not have affected the verdict. Such fleeting comments as those made by the unidentified juror were innocuous and insignificant compared with the credible evidence presented by the prosecution that defendant drank excessive amounts of alcohol before getting in his car and driving recklessly on El Camino with conscious disregard of the danger to life his conduct posed. The new trial motion was properly denied.[10]

**DISPOSITION**

The judgment is affirmed.

---

[10] Defendant argues that the cumulative prejudicial effect of the errors in his trial require reversal. Inasmuch as we find no errors, we necessarily find no cumulative prejudice.

_____
Dondero, J.

We concur:


_____
Margulies, Acting P.J.


_____
Banke, J.